# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF PATRICIA KOTHE FOR EXONERATION FROM OR LIMITATION OF LIABILITY<br><br>CARMEN BROWN,<br><br>      Respondent. | Case No. 15-cv-8876<br><br>Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

Petitioner Patricia Kothe, as owner of the recreational sailing vessel *Three's Company*, brings this action for "Exoneration from or Limitation of Liability" pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501, *et seq*. ("Limitation Act"). See [1]. This matter arises from the drowning death of Daniel Brown ("Brown"), who fell from *Three's Company* while it was sailing on Lake Michigan on August 9, 2014. Prior to this action, Respondent Carmen Brown, Administrator of the Estate of Daniel Brown, commenced a wrongful death action in the Circuit Court of Cook County, Illinois, alleging negligence by Petitioner. Through Petitioner's complaint in this Court, she seeks to limit her liability to the value of the vessel ($6,000) and to enjoin the state court action. This Court already enjoined the prosecution of any pending or further court action or proceeding against Petitioner or her property with respect to the August 9 drowning incident, in accordance with 46 U.S.C. § 30511(c), including Respondent's state court suit. See [13]. Currently before the Court is Respondent's motion for summary judgment [37]. For the reasons set forth below, Respondent's motion [37] is denied. The case is set for further status on October 17, 2017 at 9:00 a.m.

## I. Background[1]

The following facts are undisputed except where otherwise noted. The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [38] and [44]. As an initial matter, the Court notes that Respondent failed to respond to Petitioner's Local Rule 56.1(b)(3)(C) statement of additional facts contained within her response to Respondent's Local Rule 56.1(a)(3) statement of undisputed material facts. See [44] at 24–32. Therefore, pursuant to Local Rule 56.1, Petitioner's additional fact statements are deemed admitted. N.D. Ill. L.R. 56.1(a)(3) ("All material facts set forth in the statement filed pursuant to [Local Rule 56.1](b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party."); see also *Robinson v. Bandy*, 524 F. App'x 302, 305 (7th Cir. 2013) (nonmovant's submitted facts were deemed admitted under Local Rule 56.1 where the moving party did not submit a reply); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (affirming district court's decision to admit the facts set forth in moving party's Local Rule 56.1 submission where nonmovant failed to timely respond); *De v. City of Chicago*, 912 F. Supp. 2d 709, 712–13 (N.D. Ill. 2012) ("The Seventh Circuit has repeatedly held that a district

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material fact as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. Local Rule 56.1 requires the statement of material facts to include "a description of the parties" and "all facts supporting venue and jurisdiction in this court." L.R. 56.1(a)(3)(A), (B). Petitioner failed to include this required information in her Rule 56.1 statement of facts, despite having ample room to include it. See [38] (containing only 33 statements of fact). In any event, the parties do not dispute that the Court has jurisdiction over this matter. "State courts ordinarily may resolve claims by victims of torts, but the state litigation must give way to the extent necessary to protect any rights of maritime parties to limitation of liability, for on that subject federal jurisdiction is exclusive." *In re Holly Marine Towing, Inc.*, 8 F. App'x 565, 566 (7th Cir. 2001) (citing *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438 (2001)); see also 28 U.S.C. § 1331(1) (federal district courts have "original jurisdiction, exclusive of the courts of the States, of * * * any case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled"). The tort alleged in the underlying case here meets the requirements of § 1331 admiralty jurisdiction because (1) the tort occurred on a navigable waterway (Lake Michigan), (2) the negligent operation of a vessel on Lake Michigan has been found to have the potential to disrupt maritime commerce, and (3) the tort arose from an activity bearing a substantial relationship to traditional maritime activity. See *Brown v. Porter*, 149 F. Supp. 3d 963, 967 (N.D. Ill. 2016).

court has broad discretion to require strict compliance with Local Rule 56.1.") (citation and internal quotation marks omitted).

### A. *Three's Company* and the Time-Share Agreement

Petitioner is an experienced sailor, who has been sailing for more than 30 years and who has been certified by the American Sailing Association. In 1998, Petitioner purchased *Three's Company*, a 1977 O'Day 27-foot sailboat. At some point before February 2014, Richard Barrows became a co-owner of the boat.[2] [44] at ¶¶ 2, 3, 13.

In order to decrease her portion of the boat expenses, Petitioner sought time-share partners. In late winter of 2014, Brown, a 56-year-old Chicago resident, answered a flier posted by Petitioner at her yacht club. See [44] (Additional Facts) at ¶ 3. Brown ultimately entered into a six-way Time-Share Agreement ("Agreement") with co-owners Petitioner and Barrows and four other individuals, which he signed on February 16, 2014. [44-6] (*Three's Company* 2014 Time-Share Agreement, May 2014–April 2015). As relevant, the Agreement stated:

> All parties understand that sailing is a potentially hazardous activity and that we accept any and all risks of injury or death while participating in said activity. All participants agree that we will not make a claim against or sue the other partners for injury or damage unless there is gross negligence involved.

*Id*. at 2. The Agreement further provided that all monetary contributions of the time-share members (or partners) would be payable to Petitioner and would be held in a checking account in the name of "Patricia Kothe – Boat Fund." *Id*. at 1. The funds were to be "managed" by Petitioner and Barrows and "allocated toward anticipated and normal boat operating, storage and maintenance expenses" accordingly. *Id*.

As part of their arrangement, Petitioner gave Brown an orientation of the boat, which included showing him how to operate the radio, which was in a fixed location in the boat's cabin,

---

[2] Sometime following the August 9, 2014 drowning incident described herein, Barrows sold his ownership in the boat.

3

and where the emergency equipment and floatation devices were located. See [44] (Additional Facts) at ¶ 8. Specifically, *Three's Company* had the following floatation devices on board: eight to ten personal floatation devices, three square floatable cushions, and a horseshoe-shaped floatation device that was mounted in a bracket and secured on the boat by a rope. [38] at ¶¶ 4, 24. Petitioner and the other partners had discussed attaching the horseshoe-shaped device to a rope; Petitioner was not involved in actually tying the rope to the device. [44] (Additional Facts) at ¶ 11. As relevant to this case, the boat also had a safety perimeter on deck consisting of a lifeline (a thick or braided wire) that was threaded through the top of "stanchions," or vertical posts that are affixed to the deck. [44-1] (P. Kothe Dep.) at 27:15–21; [38] at ¶ 11; [44] at ¶ 14. Petitioner testified at her deposition that the lifeline had not been replaced at any point during her ownership of the boat. [38] at ¶ 13.

The parties dispute whether Petitioner was solely responsible for maintenance of the boat. Although record evidence indicates that Petitioner assumed certain responsibilities for ensuring that the boat was properly maintained and arranging that maintenance (at least monetarily and for the 2014 season), she disputes that she had the sole responsibility for this task, and she testified that, historically, the boat partners would "perform" the maintenance as needed.[3] See also [44-6] (*Three's Company* 2014 Time-Share Agreement, May 2014–April 2015) at 2 ("All parties will contribute as equally as possible according to their areas of expertise toward the maintenance and housekeeping of the boat * * *."). The same goes for ensuring that the emergency and safety equipment were in good working order; although Petitioner testified in her deposition that she "kept that as [her] responsibility," she disputes that she was solely responsible for such things. [44] at ¶¶ 5–6. In addition to routine maintenance, the record indicates that the United States

---

[3] Specifically, a former co-owner of the boat, who was an engineer and a "highly-seasoned sailor," performed "virtually all of the maintenance" from 2001 to 2011. See [44-1] (P. Kothe Dep.) at 21:12–17.

Coast Guard performed an unknown number of complimentary "inspections" of the boat, although the record is not clear when these inspection(s) occurred, but indicates only that they were sometime prior to August 9, 2014. In any event, according to Petitioner, the Coast Guard had never reported an issue with the lifeline during its inspections. [44] (Additional Facts) at ¶ 1. In addition, Petitioner confirmed in her deposition that the lifeline was "frequently" tested simply through "normal usage" of the boat. [44-1] (P. Kothe Dep.) at 24:11–13.

As an additional fact, while Chicago Harbors was launching *Three's Company* into Lake Michigan at Montrose Harbor in Chicago, Illinois at the start of the 2014 season, the boat collided with an object and a stanchion was bent. [44] at ¶ 14. The stanchion (and the wood underneath it) was subsequently repaired in April 2014, and the individual who repaired the boat allegedly told Petitioner that the lifeline was "fine."[4] *Id*.

### B. The August 9, 2014 Incident

On August 9, 2014, Brown commissioned *Three's Company* for personal use. According to Petitioner, all of the parties to the Time-Share Agreement understood that the party who commissioned the boat for use on a particular day was responsible for the pre-departure inspection of the boat, which included "checking" the life jackets and other personal flotation devices, flare guns and other emergency equipment, Coast Guard radios, engine, sails, and electrical system. In other words, the commissioning party—on August 9, 2014, Brown—was to make sure that the boat was in good working condition. [44] (Additional Facts) at ¶¶ 9, 13. The record indicates that Petitioner was not present for the pre-departure inspection nor did she have knowledge of or details regarding its occurrence.

---

[4] This statement is not hearsay (provided that Petitioner lays a proper foundation for the conversation) to the extent that it is offered to show why Petitioner did not take further actions regarding lifeline. See *U.S. v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (out-of-court statement not hearsay when offered to show its effect on listener). However, it may not be used to show that the lifeline actually was "fine."

5

Brown and Patrice San Filippo boarded the boat at Montrose Harbor (where it was docked) in the afternoon; Brown motored the boat south on Lake Michigan to Belmont Harbor, where Patrick Unkrur and Danielle Bastian came on board. *Id*. at ¶¶ 15–18. Brown failed to provide his guests with information about the nature and location of boat's floatation devices and other emergency equipment. *Id*. at ¶ 21. Still, Brown continued to drive the boat on the lake with the assistance of the motor, taking it back to Montrose Harbor, where Petitioner and Barrows joined the group. *Id*. at ¶ 22. At that point, the boat left the harbor, the sails were put up, and the boat again traveled south on the lake, this time with Unkrur at the helm. *Id*. at ¶¶ 23–24. Four of the boat's passengers testified that Brown was either drinking alcohol and/or smoking marijuana on the boat. *Id*. at 28.

At some point, *Three's Company* turned north back to Montrose Harbor, and Petitioner took the helm. *Id*. at ¶ 26. The weather had been "rough" during the entire trip (see, *e.g*., [44-3] (P. Unkrur Dep.) at 21:15), and it intensified during the trip north; a strong northeast wind that was blowing at more than 12 miles-per-hour started to become a concern and began to cause large waves. [44] (Additional Facts) at ¶¶ 30–31. While Petitioner was still at the helm, Brown left the "cockpit area" of the boat where the other passengers were located (two benches on either side of the wheel), ran to the front of the boat, and sat on the bow. *Id*. at ¶ 32. Petitioner—still at the helm—yelled at Brown to get back into the cockpit, and as Brown maneuvered along the starboard side of the boat back towards the cockpit, he "lurched" into the lifeline and then fell into the lake. *Id*. at ¶¶ 33, 35; see also [38] at ¶¶ 2, 8. Although the parties dispute whether Brown made contact with the lifeline or whether the lifeline broke at this point or at another time after Brown went overboard, it is undisputed that the lifeline broke at some point. [38] at ¶ 10; [44] (Additional Facts) at ¶ 40.

Once Brown went overboard, Petitioner yelled "Man Overboard," and—while still at the wheel—she attempted to remove the horseshoe-shaped floatation device from its mount to throw it to Brown, but she was unable to do this because she could not untie the knot securing it to the boat. [38] at ¶¶ 9, 23. She had a "sailor's knife" on board, but she did not use it to free the flotation device. *Id*. at ¶ 25. Petitioner testified that she called out instructions to those on board, but not all of the passengers recall this happening. *Id*. at ¶¶ 27–30. Petitioner left the helm some 90 seconds to two minutes after Brown fell, went into the cabin, turned on the radio, and made a mayday call over the radio. Some of the boat's passengers recall throwing floatation devices to Brown; others do not recall seeing any floatation devices thrown into the water.

As time passed, Brown floated farther and farther away from *Three's Company*. Although Brown was a tri-athlete who knew how to swim and reportedly was in good shape, he did not swim back to the boat. *Id*. at ¶¶ 15, 18. Instead, Brown floated in the water, possibly treading water, for somewhere between two to fifteen minutes—the parties dispute how long. See *id*. at ¶ 16; [44] at ¶ 16. Petitioner and others on the boat attempted to start the engine of the boat to get to Brown, but no one on board could get the motor to function; it kept stalling. [44] (Additional Facts) at ¶ 39. Because they were focused on the motor, one of the boat's two sails, which previously had been taken down, was not raised to aid with the rescue. [38] at ¶¶ 31–32. Eventually, Brown slipped from view. *Three's Company*, still having motor issues, was towed to Belmont Harbor. Brown's body was recovered on August 13.

Respondent subsequently brought a wrongful death action in the Circuit Court of Cook County, alleging negligence by Petitioner in maintaining the boat and in operating it on the day of the incident. In particular, Respondent alleges that Petitioner (1) failed to equip the boat with necessary emergency and safety equipment, (2) failed to inspect the boat and confirm the

presence of the necessary emergency and safety equipment, (3) failed to maintain the boat, (4) failed to inspect the boat for defects, (5) failed to make reasonable and necessary repairs to the boat, (6) failed to direct the boat passengers to make "necessary emergency measures to rescue" Brown, (7) failed to maneuver the boat to allow Brown's safe return to it, and (8) otherwise failed to initiate rescue measures and act in a reasonably safe manner under the circumstances. See [39-1] (state court complaint) at 2. Petitioner initiated the proceeding in this Court to limit her liability under applicable federal law. Respondent now moves for summary judgment and for lifting of the restraint on the state court proceeding. See [37].

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Petitioner). *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324.

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this

reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. 252.

## III. Analysis

It is well settled that a shipowner remains liable for her own direct fault or neglect. See *Am. Car & Foundry Co. v. Brassert*, 289 U.S. 261, 264 (1933). However, for putative liabilities that are based on acts not within a shipowner's "privity or knowledge," the Limitation Act creates "a form of action peculiar to the admiralty and maritime context," *In re Petition of Germain*, 824 F.3d 258, 263–64 (2d Cir. 2016), allowing the owner to petition a federal court to limit liability for certain claims, debts, or liabilities to "the value of the vessel and pending freight." 46 U.S.C. § 30505(a), (b); see also Fed. R. Civ. P. Supp. R. F. In other words, the Limitation Act operates to protect "innocent shipowners and investors who were sued for damages caused through no fault or neglect of their own." *Great Lakes Dredge & Dock Co. v. City of Chicago*, 3 F.3d 225, 231 (7th Cir. 1993) (quoting *Am. Car & Foundry Co.*, 289 U.S. at 264); see also *Am. Car & Foundry Co.*, 289 U.S. at 264 (the liability limited is liability imputed by law by reason of the ownership of the vessel).

Neither privity nor knowledge is defined in the Limitation Act, but privity is understood to be an owner's "personal participation * * * in the fault or negligence which caused or

9

contributed to the loss or injury." *In re SkipperLiner Indus., Inc.*, 2002 WL 32348827, at *12 (W.D. Wis. Jan. 31, 2002) (quoting *Great Lakes Dredge & Dock Co.*, 3 F.3d at 231); see also *Joyce v. Joyce*, 975 F.2d 379, 384 (7th Cir. 1992) (for an individual owner (as opposed to a corporate owner), "it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury"). "Knowledge" means that the owner had personal knowledge or means of knowledge (*i.e.*, constructive knowledge), of a condition that is likely to produce or contribute to a loss. *In re Strahle*, 294 F. Supp. 2d 998, 1000 (N.D. Ind. 2003).

In a typical Limitation Act proceeding, the admiralty court follows a two-step procedure for determining whether the vessel owner is entitled to limited liability. *In re SkipperLiner Indus., Inc.*, 2002 WL 32348827, *12. First, the court determines what acts of negligence or conditions of unseaworthiness[5] caused the accident. *Id*. "The court must determine whether the accident was caused by conduct that is actionable, for '[i]f there was no fault or negligence for the shipowner to be 'privy' to or have 'knowledge' of within the meaning of the statute, there is no liability to be limited,' and the owner would then be entitled to exoneration." *In re Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (quoting *The 84–H*, 296 F. 427, 432 (2d Cir. 1923)); see also *Ill. Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 872, 879–80 (N.D. Ill. 1989). Second, the court determines whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Ill. Constructors Corp.*, 715 F. Supp. at 880. The claimant bears the initial burden of proving negligence. Then, the burden shifts and "[t]he

---

[5] "'Seaworthiness' means such fitness as to structure, lading, captain, crew, etc., as will enable a ship to encounter the winds and battering waves of the seas that must be encountered during the season and in the places where the ship must travel so that its cargo will be carried safely and delivered in good condition." *Norris Grain Co. v. Great Lakes Transit Corp.*, 70 F.2d 32, 35 (7th Cir. 1934). Petitioner argues that, as the owner of a pleasure craft, she does not have a duty to provide a seaworthy vessel. Regardless, Respondent makes no specific argument that *Three's Company* was unseaworthy.

shipowner has the ultimate burden of proving lack of privity or knowledge in federal court." *In re Complaint of McCarthy Bros. Co./Clark Bridge*, 83 F.3d 821, 827 (7th Cir. 1996) (citing *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1303 (7th Cir. 1992) (burden of proof is on those who seek the benefit of the Limitation Act)). "Where the shipowner fails to establish lack of privity or knowledge, the federal court lacks the power under the Limitation Act to limit his liability, and the federal court must relinquish exclusive jurisdiction and allow the claimant to proceed in state court." *Id*. at 827 (quoting *Joyce*, 975 F.2d at 385).

In this case, Petitioner claims that she is entitled to application of the Limitation Act because (1) she exercised diligence in ensuring that *Three's Company* was seaworthy at all relevant times, and (2) Brown's death was not caused by her fault, neglect, or want of care, but instead was caused—at least in part—by Brown's own negligence. Respondent argues that she is entitled to summary judgment on this claim because the evidence in the record establishes that Petitioner had privity and/or knowledge of all of the negligence alleged given that Petitioner was the owner and operator of the boat, and that, on this basis alone—that is, without a judicial determination of liability (the first step of the Limitation Act analysis)—she is entitled to judgment.

Respondent bases her arguments in large part on the Seventh Circuit's opinion in *Joyce v. Joyce*, 975 F.2d 379, 385 (7th Cir. 1992). See [39] at 3. There, an injured pleasure boat passenger sued the boat's owner for negligently entrusting the boat to another individual, who was recklessly driving the boat when the passenger was seriously injured. The owner sought relief under the Limitation Act. On appeal, the Seventh Circuit found that "if a shipowner knows enough to be liable for negligent entrustment, he knows too much to be eligible for limited liability under the Act." *Joyce*, 975 F.2d at 385. That is because, the court reasoned, "the

essential thrust of the tort of negligent entrustment is that a shipowner can be liable for negligent entrustment only if he knows or has reason to know that the person being entrusted is incapable of operating the vessel safely."[6] *Id.* Accordingly, the elements of negligence and knowledge were inextricably linked and dismissal of the case was warranted because under either possible scenario (negligence-and-privity or no negligence at all), the Limitation Act could not apply.

Respondent argues that this case presents a similar scenario: without negligence, then Petitioner does not need the Limitation Act, and a finding of negligence automatically means that Petitioner had privity or knowledge so as to prevent application of the Limitation Act. Although the Court agrees that it is theoretically possible to determine the limitation issue without first deciding the liability issue, the Court disagrees that it should engage in that sort of analysis here. Specifically, the Court does not find that the existence of privity or knowledge as to all of the negligent omissions alleged in this case is so clear that limitation is impossible for Petitioner.

First, this case is distinguishable from *Joyce* in that the negligence alleged here is Petitioner's negligence both in generally maintaining the boat and in inspecting and operating it on the day of the incident, not negligent entrustment—a distinction recognized by Respondent. See also *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996) (describing *Joyce* to hold that an individual boat owner is ineligible for limited liability if the "sole allegation against [him] is negligently entrusting the boat to its operator, * * * because privity or knowledge is an element of the tort of negligent entrustment"). Respondent does not offer any argument in regard to how her negligence theories necessarily implicate Petitioner's knowledge like the negligent entrustment theory in *Joyce*. Instead, Respondent argues that the entrustment

---

[6] For reference, under Illinois law "a person may be liable for the negligent entrustment of a vehicle 'where that person entrusts the vehicle to one whose incompetency, inexperience, or recklessness *is known or should have been known* by the entrustor of the vehicle.'" *Watson v. Enter. Leasing Co.*, 325 Ill. App. 3d 914, 921 (1st. Dist. 2001) (citation omitted and emphasis added).

in *Joyce* amounted to "personal participation" that, according to Respondent, was "more remote" that Petitioner's participation in the alleged negligence here, since Petitioner was on the boat and driving it at the time Brown fell and drowned.

The Court does not understand *Joyce* to stand for or approve such a principle. The rule Respondent advocates for—that the Limitation Act has no application under every circumstance in which an owner is operating his own vessel at the time of an alleged negligent act, see [39] at 3—actually stems from *Fecht v. Makowski*, 406 F.2d 721 (5th Cir. 1969). There, the Fifth Circuit held that "when an owner is in control of and operating his pleasure craft he has privity or knowledge with respect to its operation, therefore he is not entitled to limitation for accidents arising from his negligence." *Id.* at 722. Although *Joyce* discusses a handful of cases from the Fifth Circuit regarding privity and knowledge, it does not mention *Fecht* or adopt this particular rule without citation. Even if it had, it appears that the rule would be limited to establishing Petitioner's privity or knowledge with respect to the boat's *operation*; it may not extend to the negligent maintenance and inspection claims made by Respondent.[7]

In any event, considering the entire record before it, the Court cannot agree with Respondent that Petitioner's privity or knowledge is "clearly an undisputed issue." See [39] at 8. Instead, the Court concludes that it is not "truly impossible under any set of circumstances" for Petitioner to establish the absence of privity or knowledge of the negligence alleged, depending on what negligence, if any, the trier of fact determines to have been committed. *Suzuki of*

---

[7] Respondent also cites to and quotes from *Complaint of Ingoglia*, 723 F. Supp. 512 (C.D. Cal. 1989), in support of her argument that summary judgment should be granted on privity grounds where an owner was in control of the boat at the time of the alleged injury. See [39] at 7. However, the Court finds the situation in *Ingoglia* distinguishable, particularly because *Ingoglia* only involved one "specific fact"—that the owner was in control of the boat at the time of the accident. Accordingly, in this void, the Court found that summary judgment on privity grounds was appropriate. The same logic cannot apply here, where there are parties have set forth many facts above and beyond the single fact that Petitioner was onboard and at the helm of *Three's Company* at the time of the accident and the negligent omissions are not limited to conduct during the incident itself.

13

*Orange Park, Inc.*, 86 F.3d at 1064; see also *In re Messina*, 574 F.3d at 127 ("the mere presence on board of an owner does not constitute such privity as will preclude limitation of the owner's liability") (internal quotation marks omitted).[8] This is particularly true here, where (1) Respondent alleges numerous negligent omissions, some pertaining to Petitioner's long-term maintenance of the boat, others pertaining to the pre-departure investigation on the day of the incident, and others related to Petitioner's actions once Brown fell in the water and (2) the record reflects that Petitioner was not present on the vessel when all of the alleged negligence occurred. See *Suzuki of Orange Park, Inc.*, 86 F.3d at 1064 (privity or knowledge is measured against the specific negligent acts or unseaworthy conditions that actually caused or contributed to the accident). In short, because the record contains a number of factual disputes concerning these issues—not only regarding privity or knowledge, but also regarding Petitioner's alleged negligence—Respondent's contention that summary judgment can be determined by assessing part two of the *Joyce* test fails. The Court therefore will structure the remainder of its analysis in accordance with the normal two-part test.

### A.  Negligence

The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law," including (i) duty, (ii) breach, (iii) causation, and (iv) damages. See 1 Thomas J. Schoenbaum, ADMIRALTY & MARITIME LAW § 5–2 (5th ed. 2011); see also *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572–73 (7th Cir. 2004) (same).

---

[8] In reaching this conclusion, the Court respectfully distinguishes *In re Lee*, 2009 WL 3387955 (N.D. Ill. Oct. 14, 2009). In that case, the court applied *Joyce* on a motion to dismiss a limitation complaint regarding a claim of negligence arising from an incident where a boat sank in Lake Michigan. The owner of the boat was captaining it at the time it sank, and therefore, since the only negligence alleged was in the boat's sinking, the court reasoned that the owner/captain had knowledge both the vessel and the events preceding its sinking. See *id*. at *2. Although it is undisputed that Petitioner was at the helm at the exact time of the fall and drowning incident, the claims of negligence here extend far beyond the incident itself to how the boat was maintained and prepared for its voyage.

Here, it is undisputed that Petitioner and Respondent specifically contracted to limit any claims brought against the other to gross negligence, which has been defined as "very great negligence" but something less than willful, wanton and reckless conduct. *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997). In determining liability in maritime cases, the Court considers "the specific factual circumstances under which the accident took place." *Folkstone Mar., Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995).

On account of her view that summary judgment is warranted on the limitation factors alone, Respondent's motion does not directly address the question of Petitioner's negligence (or gross negligence). Still, Respondent sets forth various acts or omissions that she believes demonstrate Petitioner's negligence and conclusorily states that "[i]f there was negligence in the operation or maintenance of the boat, only [Petitioner] could be guilty of it." [39] at 7–8. This is not a sufficient showing to warrant summary judgment in favor of Respondent, particularly where she bears the burden of proof on the issue.

In any event, the Court concludes that Petitioner has identified ample evidence from which a reasonable factfinder could conclude that she was not grossly negligent. First, Petitioner has presented evidence that calls into question the extent of her duty to maintain the lifeline and ensure the boat had adequate safety and emergency equipment. Specifically, she disputes that she had the sole duty to maintain the boat in good condition and properly equip it, asserting instead that the Agreement allocated this duty to all "partners." Second, Petitioner has also pointed to evidence that the duty to maintain the lifeline was not breached. For example, Petitioner identifies evidence that the boat had been inspected by the Coast Guard on previous occasions and that, although they were not replaced at any time from 1998 until the incident, the lifeline was frequently "tested" through normal use of the boat. She also identified evidence that

15

the alleged duty to keep equipment on the boat was not breached, as multiple floatation devices and other emergency equipment were kept there. Third, Petitioner disputes that the lifeline caused Brown to fall from the boat. Instead, Petitioner points to evidence that Brown fell "over" the lifeline on account of inclement weather and Brown's own negligence.

Respondent also argues that Petitioner was negligent in operating the boat on the day of the incident for various reasons, namely that she failed to inspect to ensure the boat had safety and emergency equipment on board and she failed to properly initiate and execute actions to rescue Brown. Again, Petitioner has pointed to evidence from which a reasonable factfinder could conclude that she was not grossly negligent in this regard. For instance, Petitioner points to evidence that she did not owe a duty to inspect the boat prior to its departure. Instead, according to Petitioner, the time-share partners considered the commissioning individual to be the "captain" of the boat for the day or voyage for which it was commissioned, regardless of whichever other partners were on board. Thus, Petitioner's evidence indicates that Brown was the captain on the day of the incident, not Petitioner. If the trier of fact accepts that testimony, then Brown was responsible for ensuring that the boat was in good working condition and had all of the necessary safety and emergency equipment onboard for the trip. He was also responsible for educating the other passengers about the boat and its safety equipment. Further, Petitioner points to evidence that she did not breach a duty of care in her efforts to rescue Petitioner. She asserts that (1) Brown was only floating in the lake for a short time, (2) she issued directions to the other passengers, (3) she tried to remove the horseshoe-shaped floatation device from the boat to throw to Brown, (4) she issued a mayday call, and (5) she worked with others to attempt to start the engine to maneuver the boat to Brown. Although her efforts were ultimately

unsuccessful, they still raise a question for the factfinder as to whether they were grossly negligent.

Finally, Petitioner also has identified evidence from which a reasonable factfinder could find that Brown caused or contributed significantly to his own injuries. Specifically, Petitioner points to evidence that Brown had been drinking and/or smoking marijuana prior to the incident and that he was in areas of the boat that he should not have been, given the weather conditions. Accordingly, the determination of whether Petitioner was grossly negligent in the ways alleged by Respondent (in whole or in part) is a question to be decided by the trier of fact.

### B. Privity or Knowledge

Even if Respondent had established Petitioner's gross negligence as a matter of law, she still would not be entitled to summary judgment because factual disputes remain concerning Petitioner's privity or knowledge of the alleged negligence. Again, privity is defined as some personal participation of the owner in the fault or negligence that caused or contributed to the injury. *In re SkipperLiner Indus., Inc.*, 2002 WL 32348827, at *12; see also *In re Messina*, 574 F.3d at 126 ("The phrase 'privity or knowledge' is a 'term of art meaning complicity in the fault that caused the accident.'") (citation omitted); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1159 (2d Cir. 1978) ("Where the owner's negligent act caused the alleged injury * * * all of the requirements of 'privity' are satisfied.") (quotations and citation omitted).

As noted above, in opposing Respondent's motion for summary judgment, Petitioner has pointed to evidence in the record that she did not cause, participate in, or know about at least some of the numerous negligent omissions alleged by Respondent. Although Petitioner cannot seriously maintain that she did not participate in the allegedly negligent rescue events, she has highlighted evidence regarding her lack of participation or knowledge in certain negligent

omissions regarding the boat's maintenance and its pre-departure inspection on the day of the incident. For instance, Petitioner offered evidence that it was Brown's duty, as the captain for the August 9, 2014 voyages, to inspect the boat and ensure the presence of certain safety and emergency equipment prior to launch. What is more, the record indicates that that Petitioner was not present until sometime after *Three's Company* already had been launched and out on the lake, meaning that she was not present for the pre-departure investigation that was supposed to occur. In addition, Petitioner identifies evidence that other boat partners contributed to the maintenance and repair of the boat, of which she may not have had information. Accordingly, the Court concludes that factual disputes as to what acts of negligence, if any, caused Brown's death and Petitioner's privity and/or knowledge of the negligent acts alleged preclude summary judgment on Petitioner's claim for exoneration or limitation of liability at this time.

**IV. Conclusion**

For the reasons stated above, the Court denies Respondent's motion for summary judgment [37]. This case is set for further status on October 17, 2017 at 9:30 a.m.

Dated: September 26, 2017

_____
Robert M. Dow, Jr.
United States District Judge